## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

CHRISTOPHER JOSEPH QUAGLIN,      :

                              :

              Petitioner,      :

                              :

v.                           :     Civil Action No. 1:22cv01154-TNM

                              :

MERRICK GARLAND, et al.,        :

                              :

             Respondents.     :

### RESPONDENT TED HULL'S RESPONSE TO
### PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. 2241 AND
### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Respondent, Ted Hull, Superintendent of the Northern Neck Regional Jail ("NNRJ"), by counsel, hereby opposes the Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief ("Petition") in the above-captioned matter. As addressed below, the Petition lacks merit and should be denied.

## I.     Background

Petitioner Christopher Joseph Quaglin ("Quaglin") is a federal pre-trial detainee who has been incarcerated at NNRJ per order of the U.S. Marshal's Service ("USMS") from December 21, 2021 to the present. On April 26, 2022, Quaglin filed a Petition challenging the lawfulness of his detention at NNRJ, together with a complaint seeking preliminary and permanent injunctive relief, declaratory relief, and damages.[1] In his Petition, and specific to NNRJ, Quaglin claims, *inter alia*, that NNRJ has not attended to his medical and dietary needs, housed him in solitary confinement, and limited communication with his attorney and others. He also claims that because the NNRJ

---

[1] Quaglin raises constitutional challenges and alleges facts related to his incarceration at other facilities where he was held prior to NNRJ against Respondent Garland. Superintendent Hull will respond only to Quaglin's allegations regarding his incarceration at NNRJ.

Grievance Procedure is "unavailable," he was not required to exhaust administrative remedies ahead of filing this Petition.

In support of his release, Quaglin alleges the following legal grounds: (1) deliberate indifference to safety and medical needs in violation of the Fifth Amendment right to Due Process; (2) illegal use of solitary confinement in violation of the Fifth Amendment right to Due Process; (3) illegal jailing in solitary confinement in violation of the Fifth Amendment right to Due Process and the Eighth Amendment's prohibition on cruel and unusual punishment; (4) interference with right to counsel and participation in defense in violation of the Sixth Amendment; and (5) retaliation in violation of the First Amendment and right to redress grievances.

## II.    Legal Standards

### A.  Habeas Corpus

A writ of habeas corpus tests the legality of a prisoner's detention. The habeas corpus proceeding is specifically designed to protect individual liberty and redress unlawful detention.  "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and ...the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973); *see also Fay v. Noia*, 372 U.S. 391, 430 (1963) (explaining that the "jurisdictional prerequisite" of a habeas proceeding is "detention *simpliciter"*).

According to this Circuit, "although the Supreme Court has left the question open, the law of this circuit—which is consistent with the weight of the reasoned precedent in the federal Courts of Appeal—compels us to conclude that a prisoner may, in a federal habeas corpus petition, "challenge the conditions of his confinement." *Aamer v. Obama*, 742 F.3d 1023, 1038, 408 U.S.

App. D.C. 291 (D.C. Cir. 2014) (quoting *United States v. Wilson*, 471 F.2d 1072, 1081 (D.C.Cir. 1972)).

### B.  Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right" that a court must grant only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). To make a sufficient showing, a plaintiff must establish: (1) a likelihood of success on the merits; (2) that irreparable harm will result in the absence of an injunction;   (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest.  *Id.* at 20.

In this Circuit, "the movant has the burden to show that all four factors, taken together, weight in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197, 410 U.S. App. D.C. 80, 84 (D.C.Cir. 2014) (citations and internal quotation marks omitted).  "The four factors have typically been evaluated on a 'sliding scale.'" *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291, 387 U.S. App. D.C.  205, 208 (D.C.Cir. 2009).  Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291-92, 387 U.S. App. D.C. at  208.

This Court has noted that "it is not clear whether" the D.C. Circuit's "sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*." *Banks v. Booth*, No. 20-849 (CKK), 2020 U.S. Dist. LEXIS 68287, *16-17 (D.D.C. Apr. 19, 2020) (citing *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015)).  "Several judges on the D.C. Circuit have 'read *Winter* to at least suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a

preliminary injunction …. However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis." *Id*. (citations omitted).

### C.  Declaratory Judgment

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). This language "has long been understood 'to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)).

### III.   Argument

### A.  Quaglin failed to exhaust administrative remedies as required by the PLRA.

Quaglin alleges that NNRJ's Grievance Policy was not available to him, thus relieving him of the obligation to exhaust administrative remedies ahead of filing this Petition. His claim is baseless and his failure to exhaust available administrative remedies bars this action.

The Prison Litigation Reform Act ("PLRA") mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit.  42 U.S.C. § 1997e(a) ("No action, shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). This requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Exhaustion is required even where an inmate seeks remedies, such as money damages,

---

that are not available in the administrative proceedings. *See Booth v. Churner*, 532 U.S. 731, 740-41 (2001). The administrative remedies are dictated by the prison. *See Jones v. Bock*, 549 U.S. 199, 218 (2007).

To satisfy this requirement, a plaintiff must avail himself of every level of available administrative review, which means "using all steps that the agency holds out, and doing so properly." *Woodford v. Ngo*, 548 U.S. 81, 91 (2006) (internal quotation marks and citation omitted). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* In *Ross v. Blake*, 578 U.S. 632, (2016), the Supreme Court held that the PLRA's exhaustion requirement is statutorily mandated and not amenable to judicially created exceptions. The Court noted, however, that under the PLRA an inmate need not exhaust "unavailable" remedies. In this context, "available" means "'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Id*. at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 737-738 (2001)). The Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id*. at 643.

> First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide relief to aggrieved inmates." ... Second, an administrative process is likewise unavailable when it is "so opaque" that "no ordinary prisoner can discern or navigate it." *Id.* Finally, an inmate need not exhaust administrative remedies when prison officials thwart the inmate's access to the grievance procedure "through machination, misrepresentation, or intimidation."… "[S]uch interference with an inmate's pursuit of relief renders the administrative process unavailable."

*Id.* (internal citations omitted).

Here, Quaglin alleges that his access to the NRRJ Grievance Procedure operates as a "dead end" and has been thwarted by NRRJ leadership and staff, through "a litany of roadblocks," "mocking," "purposeful obfuscation," trashing grievances or falsely marking them as sufficiently addressed, and forged signatures. Petition, ¶¶ 154-159. The evidence proves otherwise.[2]

NNRJ Policy N-02, Inmate Grievance, sets forth a multi-step procedure and timeline for the submission, receipt, response to, and appeal of inmate grievances. (Ex. 1, Policy N-02) NNRJ maintains a Grievance Log, detailing the grievance number, the inmate, the department head, the department to which the grievance is directed, the dates it was received and returned, whether it was appealed, and the disposition. Appeals proceed through the department, the Major and the Superintendent. All of Quaglin's grievances are recorded in the Grievance Log. (Ex. 2, Grievance Log; Ex. 3, Grievances) As shown, Quaglin filed 12 grievances to date, and received initial responses to all. He noted his intention to appeal four of them, Nos. 22-078, 22-084, 22-100, and 22-059. With regard to Nos. 22-078 and 22-084, Quaglin never filed an appeal and thus did not avail himself of further administrative review.[3] With regard to No. 22-100, Quaglin received an appeal form but did not submit it back. Quaglin only appealed one Grievance, No. 22-059, against the kitchen, to the Major and then to the Superintendent, as recorded in the Major's Grievance Appeal Log and the Superintendent's Grievance Appeal Log.

---

[2] Quaglin's allegation regarding the U.S. Marshal's surprise inspection and internal audit of the DC Jail's grievance procedures does not inform his claim against NNRJ. Petition, ¶ 161.

[3] Grievance Nos. 22-073 and 22-084 related to a purported PREA violation. NNRJ does not have any documentation of a PREA complaint. (Hull Aff., Ex. 12) In addition, Quaglin was interviewed on May 11, 2022 about the allegations. He could not identify the date of the alleged occurrence, ceding the issue to his attorney, and said his concern was a verbal comment from an officer, such as "I got your ass." His grievances were responded to. (Ex. 4, PREA synopsis; Ex. 3, Grievances, pp. 17,21)

Quaglin submitted Grievance No. 22-059, detailing complaints about his diet, on April 11, 2022.  The response was returned to him on April 14, 2022, stating that, "The medical department is managing your medical needs.  Regarding your diet, you are receiving a Gluten Free Diet. Any exceptions you have brought to our attention have been addressed." (Ex. 3, Grievances) Quaglin's appeal was logged in on April 15, 2022, and Major Lewis responded on April 22, 2022 that "You are receiving the appropriate diet.  Any exceptions were rectified once we were aware.  Medical is following doctor's orders." (*Id.*)  Quaglin's appeal to Superintendent Hull received back from Quaglin on  April 28, 2022 stated only, "From now on you will be dealing with my lawyer Mr. Joe McBride directly.  All issues will be recorded (as always) and presented at a later time by Mr. McBride." (*Id.*)

On this record, Quaglin cannot substantiate that the NNRJ Grievance procedure was not available to him. Nor can he establish that he has exhausted his administrative remedies. Quaglin had access to grievance forms, filed multiple grievances on different issues, navigated the process, and received timely and substantive responses.  He availed himself of the full appeal procedure just once, and unilaterally chose to terminate that appeal, ceding any further issues to his attorney. Further, as discussed in Section B. below, it is indisputable that the NNRJ medical department and kitchen were working to provide Quaglin with the appropriate diet.  Quaglin failed to satisfy the PLRA's exhaustion requirement.  His Petition should be denied on this basis alone.

**B.  Quaglin cannot establish deliberate indifference to his safety or medical needs under the Fifth Amendment.**

In his First Claim for Relief, Quaglin alleges that Superintendent Hull has been deliberately indifferent to his safety and medical needs.  His claim is without merit; the record reveals that Quaglin has received continuous and extensive attention for his medical condition while at NNRJ.

Fifth Amendment claims brought by pretrial detainees are analyzed by the standards governing Eighth Amendment claims brought by prison inmates. *Young v. Dist. of Columbia*, 107 F. Supp. 3d 69, 77 (D.D.C. 2015). *See Russell v. Corrections Corp. of Am.*, No. 17-cv-313, 2019 U.S. Dist. LEXIS 100565, at * 6  n. 2 (D.D.C. June 17, 2019) ("[T]he Eighth Amendment standard for cruel and unusual punishment may be applied to custody of a pretrial detainee—even though such detainees have not been convicted of a crime and may not be subjected to punishment in any manner—since the conditions of confinement are comparable." (internal quotation mark omitted) (quoting *Young*, 107 F. Supp. 3d at 77)). Thus, Quaglin must (1) allege a deprivation that is "objectively, 'sufficiently serious,'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)),   and (2) establish that the deprivation results from the detention official's "deliberate indifference." *Id.* at 828.

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Court held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838.

Under the test adopted by the Court, "an Eighth Amendment  claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. As such, "a prison official may be held liable under the Eighth Amendment for

denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.  *See Anderson v. District of Columbia*, 810 Fed. Appx. 4, 6 (D.C.Cir. Feb. 4, 2020) (noting "[t]his 'deliberate indifference' standard is demanding. It is not satisfied by a complaint of 'inadvertent failure to provide adequate medical care,' or by allegations that a 'physician has been negligent in diagnosing or treating a medical condition.' … Instead, a complainant must allege that 'officials had subjective knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk.'" (citations omitted)).

Here, Quaglin alleges Superintendent Hull's deliberate indifference to his diet and medical care for celiac disease.  Quaglin's jail and medical records, however, indicate that NNRJ provided Quaglin with a constitutional level of care. First, with regard to Quaglin's dietary needs, the NNRJ medical department submitted Special Diet Request Forms for Quaglin as follows: on December 21, 2021 (when he first arrived), the request was made for a wheat and gluten free diet; on December 27, 2021, a vegetarian diet request was added (Quaglin objected to this); on January 3, 2022, 1/day Ensure was added per Dr. Dudley; and on February 1, 2022, Dr. Dudley continued the wheat and gluten free diet, and added enhanced portions.  (Ex. 5, Special Diet Request Forms).  In addition, the following documents demonstrate NNRJ's efforts to ensure that Quaglin received, and continues to receive, the special diet prescribed by NNRJ medical personnel: (1) Correctional Food Service Manual, 4-week menu, and requests for guidance from Trinity Services Group on gluten free diet (Ex. 6); (2) Quaglin's gluten free diet log from December 29, 2021 through May 26, 2022 (Ex. 7); (3) synopsis of Quaglin's diet, requests, and responses (Ex. 8); (4) pictures of Quaglin's food trays from April 13, 2022 through May 26, 2021 (Ex. 9); and (5) confirmations from NRRJ food distributor that various foods are gluten free (Ex. 10).

With regard to medical care, Dr. Dudley saw Quaglin on January 4, 2022, prescribed Ensure and a gluten free diet, and ordered labs.  On January 26, 2022, Quaglin had lab work done. On February 1, 2022, Dr. Dudley reviewed Quaglin's labs and consulted with him.  Dr. Dudley noted Quaglin's history of celiac disease and weight loss, added vitamins, continued his wheat and gluten free diet, and ordered "enhanced portions diet." Dr. Dudley saw Quaglin again on February 1, 2022, February 16, 2022, and March 8, 2022.  In addition, the nursing progress notes reflect multiple interactions between Quaglin and the medical staff from December 2021 through May 2022. (Ex. 11, Medical Record)

The NNRJ medical department must submit a Prisoner Medical Request ("PMR")  for outside medical care and consultations for Quaglin, as with any other federal inmate, to the USMS for approval. On March 9, 2021, NNRJ submitted a PMR for Quaglin for "GI Intolerance and Gluten Intolerance." Knowing how long it takes to get appointments, NNRJ scheduled Quaglin for a consultation with Gastroenterology Associates of Fredericksburg ahead of receiving approval for the PMR. The USMS requested additional information and finally approved the request on April 7, 2022.  (Ex. 13, PMRs and Approvals)

 Quaglin had a GI consultation on April 29, 2022.  (Ex. 11, Medical Record)  A full set of vitals was taken that day and the following labs were ordered: CBC, Platelets & Auto Diff, CMP, Celiac AB Profile, HLA DQ2, HLA DQ8-Quest, Ferritin, Iron/TIBC%Iron SAT, Gluten Sensitivity Antibody Cascade. The lab work was completed on April 29, 2022 at NNRJ, and final results were faxed from Lab Corp to NNRJ on May 18, 2022, which indicated a negative result for the Gluten Sensitivity Screen and that the results were "not suggestive of gluten sensitivity." (Ex. 11, Medical Record)  NNRJ sent the lab report to Gastroenterology Associates of Fredericksburg on that date.  On May 2, 2022, NNRJ submitted a PMR to the USMS for  a follow up appointment

with Gastroenterology Associates of Fredericksburg, and the USMS approved a GI consultation for "celiac disease with weight loss, food intolerance, and GI issues."   (Ex. 13, PMRs and Approvals)  The appointment has been scheduled.

With regard to COVID, Quaglin was not intentionally placed in a pod with others who had tested positive. He arrived at NNRJ on December 21, 2021, as case numbers were rising due to the Omicron surge and tested negative on a rapid test.  Quaglin was housed in J pod (housing for 80 inmates), where one inmate had tested positive the day before and was immediately removed and isolated.  Another inmate from that unit tested positive on December 25, 2022 and was promptly isolated.  Quaglin and two others tested positive on December 27, 2022 and were isolated.  (Ex. 12, Hull Aff.)  While NNRJ took recommended precautions, like other facilities it could not completely stop the spread.  (*Id.*) Quaglin cannot prevail on a deliberate indifference claim related to his alleged COVID exposure. *See e.g., United States v. Lee,* 451 F. Supp. 3d, 1, 8  (D.D.C. 2020) (holding "COVID-19 presents undoubtedly serious circumstances, but [the plaintiff] has not alleged that prison authorities have been deliberately indifferent to this threat, and he would be hard pressed to do so, given the aggressive precautions that DOC appears to have undertaken to prevent the spread" within its facilities.)

On this record, Quaglin cannot establish deliberate indifference; he cannot dispute the provision of medical care and attention to his diet.  Further, Quaglin's apparent disagreement with the medical care provided at NNRJ is an insufficient basis for a constitutional claim. See  *Banks v. York*, 515 F. Supp. 2d 89, 103 (D.D.C. 2007) (quoting *Chance v.  Armstrong*,  143 F.3d  698, 703 (2d Cir. 1998)) ("It is well-established that  mere disagreement over the proper treatment does not create a constitutional claim." Prisoners must be provided with treatment that is medically adequate, but "the fact that a prisoner might prefer a different treatment does not give rise to

an Eighth Amendment violation."); *Turner-Bey v. Director of Medical Services (CCHP)*, No. 04-1744, 2005 U.S. Dist. LEXIS 38007 (D.D.C. Dec. 27, 2005) (holding evidence of medical treatment by prison officials negates assertion of deliberate indifference).

### C. Quaglin cannot establish a cognizable claim under the Fifth or Eighth Amendments.

In his Second and Third Claims for Relief, Quaglin challenges conditions of confinement pursuant to the Fifth and Eight Amendments, specifically complaining of his being held in "solitary confinement." As the record demonstrates, Quaglin has been held in punitive detention at several points during his incarceration at NNRJ due solely to his committing major rules infractions.

"[A]n individual not yet convicted of a crime must challenge his treatment or the conditions of his confinement under the Due Process Clause of the Fifth or Fourteenth Amendments rather than the Eighth Amendment." *Ali v. Rumsfeld*, 649 F.3d 762, 769-70 n.10, 396 U.S. App. D.C. 381, 388 n. 10 (D.C. Cir. 2011). The rights of pre-trial detainees are different than the rights of post-conviction detainees. Because pre-trial detainees are presumed innocent, they are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). "While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment [under the Eighth Amendment], a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description." *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) (quoting *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992)).

In *Banks v. Booth*, No. 20-849 (CKK), 2020 U.S. Dist. LEXIS 68287 (D.D.C. Apr. 19, 2020), this Court referenced *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), where the Supreme Court held that a pre-trial detainee has only to show that a use of force was objectively

unreasonable and does not have to establish deliberate indifference.  The Court noted that "the *Kingsley* court relied on *Bell v. Wolfish*, [441 U.S. 520 (1979)], a case pertaining to prison conditions," and citing to cases in other circuits, concluded that "[t]ogether *Kingsley* and *Bell* provide persuasive authority that a pre-trial detainee need only show that prison conditions are objectively unreasonable in order to state a claim under the due process clause." *Banks*, 2020 U.S. Dist. LEXIS 68287, at *22-23.  *See C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) (applying *Kingsley* standard to due process claims of pre-trial detainees challenging conditions of confinement); *United States v. Moore*, No. 18-cr-198 (JEB), 2019 U.S. Dist. LEXIS 104300 (D.D.C. June 21, 2019) (same).  Under this standard, the court must consider whether the conditions of confinement were "reasonably related" to the stated objective, or whether they were "excessive" in relation thereto.  *See Bell*, 441 U.S. at 537-39, 539 n.20.

Significantly, in *Bell*, the Supreme Court distinguished between "punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." 441 U.S. at 537. Such "regulatory restraints" include administrative and disciplinary measures used by responsible jail officials "to maintain security and order" in detention facilities. *Id*. at 540. Accordingly, jail officials are entitled to discipline pretrial detainees for infractions committed in custody and to impose restrictions for administrative purposes without running afoul of *Bell. See e.g.,  Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996) (explaining that jail may discipline pretrial detainee to "preserv[e] 'internal order and discipline'") (quoting *Bell*, 441 U.S. at 546)).

Here, Quaglin challenges his time in punitive detention, which he pejoratively labels as "solitary confinement."  Quaglin was placed intermittently in punitive detention, used as a disciplinary measure pursuant to NNRJ's Policy J-02, Restrictive Housing, and Policy J-03, Inmate

---

Discipline, as a result of his own rules infractions.  (Ex. 14, Policy J-02, Policy J-03)  Policy J-03 sets forth the code of inmate violations and disciplinary penalties, including punitive detention for major offenses.  NNRJ inmates are oriented on the disciplinary policy and it is in the Inmate Handbook. (Ex 12, Hull Aff.; Ex. 15, Inmate Handbook).  Punitive detention can be from one to fifteen calendar days per offense, and all time spent in pre-hearing detention is credited.  (*Id.*) Punitive detention at NRRJ is served in two-person cells; however, they are not  always full.  (Ex. 12, Hull Aff.)

During Quaglin's approximately five months at NNRJ, among other incidents, he has committed several major offenses, which resulted in charges and punitive detention (Ex. 16, Incident Reports, pp. 4, 5, 7, 8-13, 19-23, 25; Ex. 17, Disciplinary Offense Reports)  On January 19, 2022, he received seven days for disobeying a direct order and disrespectful behavior towards staff.  On March 2, 2002, Quaglin received a total of 30 days for disrespectful behavior towards staff and for approaching or gathering in a threatening manner.  On March 23, 2022, Quaglin received 15 days for fighting with another inmate.[4]  Quaglin's last stay in punitive detention ended on Aril 29, 2022. In total, he has received 52 days of punitive discipline, of which he has served 48.  (Ex. 12, Hull Aff.)  The Institutional Classification Committee ("ICC") made and reviewed Quaglin's housing assignments per policy.  (Ex. 18,  Policy N-01, Classification of Inmates, Policy J-05, Institutional Classification Procedures, ICC Forms)

---

[4] Quaglin claims that he was attacked and unfairly put into punitive detention.  The record proves otherwise.  On March 6, 2022, Officer Tyler Taylor was asked to review camera footage of an incident occurring on March 5, 2022 between Quaglin and another inmate.  The Officer observed Quaglin follow the other inmate from the dayroom phone area into a cell and, a few minutes later, observed the two inmates "actively involved in a physical altercation." Quaglin was brought to medical and then to the ER immediately after the incident and seen for a gash over his right eyebrow. (Ex. 16, Incident Reports, pp. 9-13; Ex. 11, Medical Record)

NNRJ's housing and classification system's foundation is compliance and behavior-based. Quaglin's housing assignments were thus based on his behavior, compliance with NNRJ rules, and his current status.  He has been housed consistent with inmates who also fail to comply with NNRJ rules.  NNRJ has housed more than 20 other inmates charged with crimes related to January 6, 2020.  These inmates have complied with NNRJ rules and have been and are currently housed in premium pods, which the inmates often call "honor pods."  (Ex. 12, Hull Aff.)

The disciplinary measures which Quaglin challenges were not imposed to punish him; rather, as the record shows, they were reasonably related to the legitimate governmental purpose of maintaining security and order. *See Bell*, 511 U.S. at 540.  Quaglin's likening his circumstances, caused only by his failure to follow NNRJ rules, to Nelson Mandela and others held in prolonged solitary confinement, is disingenuous and not deserving of a response. *C.f. Glossip v. Gross*, 576 U.S. 863 (2015) (Breyer, J. Dissenting) (discussing deleterious harms to death row inmates held in prolonged solitary confinement).

### D.  Quaglin cannot establish a Sixth Amendment violation.

In his Fourth Claim for Relief, Quaglin alleges interference with his right to counsel and to participate in his defense in violation of the Sixth Amendment.  With regard to NNRJ, Quaglin alleges that attorney-client phone calls have been monitored, he is not permitted video calls with his attorney, and he has not been given discovery materials.  Petition, ¶¶ 107, 108, 110, 196, 199. The record belies his claims.

The Sixth Amendment assures the accused "the assistance of counsel for his defense." *United States v. Watson*, 894 F. 2d 1345, 1347 (D.C.Cir. 1990). The Supreme Court has noted that "[n]ot every restriction on counsel's time or opportunity to investigate or consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v.*

*Slappy*, 461 U.S. 1, 11  (1983). Indeed, an inmate's constitutional right of meaningful access to the courts does not require "any particular means of access, including unlimited telephone use." *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992).  *See United States v. Lentz*, 419 F. Supp. 2d 820, 835 (E.D.Va. 2005) (citing *Bounds v. Smith*, 430 U.S. 817, 833 (1977)) ("Prison officials, exercise 'wide discretion' in determining the manner and method that inmates will be allowed to access the court system and their attorneys; prisoners are not entitled to any particular method of access to the courts or to their lawyers.").  Further, "it is well settled that some showing of prejudice is a necessary element of a Sixth Amendment claim based on an invasion of the attorney client relationship." *United States v. Chavez*, 902 F.2d 259, 266 (4th Cir. 1990) (citing *Weatherford v. Bursey*, 429 U.S. 545, 558  (1977); *United States v. Kelly*, 252 U.S. App. D.C. 308, 790 F.2d 130, 136 (D.C.Cir. 1986); *Clutchette v. Rushen*, 770 F.2d 1469, 1471 (9th Cir. 1985), *cert. denied*, 475 U.S. 1088 (1986)).

Here, Quaglin cannot establish any significant restriction on his right to communicate with counsel.  Nor does he allege or establish prejudice.  NNRJ Policy P-03, Inmate Telephones and Visitation, provides for in-person visitation. Quaglin and his counsel could avail themselves of that opportunity at any time.  (Ex. 19, Policy P-03) The Policy also allows phone access in housing units from morning until night, and that, unless in punitive isolation, inmates in Special Purpose Housing are allowed phone access at least once daily.  Further, incoming and outgoing legal phone calls are not limited or restricted, and all calls between inmates and counsel identified as such are not monitored or recorded. (*Id*.; Ex. 20, Securus Website, "All calls except to their Attorney of Record, are subject to monitoring and recording.).  In addition, Superintendent Hull has informed Quaglin's counsel that he may communicate with Quaglin through toll-free phone calls when requested. (Ex. 12, Hull Aff.)  Quaglin's Phone Log reveals that from December 21, 2021 through

---

May 25, 2022, he attempted 1090 phone calls, and completed 680.  (Ex. 12, Hull Aff.)

NNRJ also permits video visitation between inmates and counsel.  Remote Video Visitation Rules provide that "Attorney Video Visits are not recorded and are not monitored by the staff," but that a log of the visit is recorded. The Rules provide further that "Use of cellphones and any other electronic devices are prohibited (excluding device used for the actual visit)," and "Violators will be barred from future visitation."  (Ex. 21, Attorney Remote Video Visitation)  The log of Quaglin's Attorney Video Visits demonstrates that he had several video visits with his attorney. (Ex. 22, Quaglin Attorney Video Log) However, Quaglin's attorney, Mr. McBride, recorded videocalls with Quaglin and posted them on social media.  (Ex. 23, Mar. 25, 2022 Incident Report) Mr. McBride's action was in violation of the Rule prohibiting the use of any electronic devices during video calls, and in violation of NNRJ's rule against photographing inmates. (Ex. 24, Lobby Sign)  As a result of these breaches, Superintendent Hull barred Mr. McBride from future video visitation.  (Ex. 12, Hull Aff.)

Not only does the record reflect that Quaglin had ongoing access to his attorney, but he fails to allege prejudice to his defense.  While he claims that officials have not provided him with his discovery, as Superintendent Hull attests, no such materials have been mailed to or delivered to NNRJ.  (Ex. 12, Hull Aff.)  Quaglin's Sixth Amendment claims are without merit.

### E.  Quaglin cannot establish a First Amendment violation.

In his Fifth Claim for Relief, Quaglin alleges that NNRJ retaliated against him for the exercise of his First Amendment rights and right to petition respondents and members of Congress to redress his grievances.  Petition, ¶ 200.  Quaglin cannot substantiate his claim.

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Anderson-Bey v. District of Columbia*, 466 F. Supp. 2d 51, 65 (D.D.C. 2006) (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (citation omitted)); *see Garcia v. District of Columbia*, 56 F. Supp. 2d 1, 5 (D.D.C. 1998).

Quaglin cannot establish these factors. First, as demonstrated above, NNRJ did not take adverse action against Quaglin because he engaged in protected conduct. NNRJ officials considered his grievances, responded, ensured his medical care and access to counsel, and, like all other inmates, required that he abide by NNRJ's rules in order to ensure the safety and security of the facility, the staff, and the other inmates. Subjecting Quaglin to discipline for rules violations does not constitute adverse action. There is no evidence that Quaglin was precluded from exercising his First Amendment rights to petition Superintendent Hull. In fact, Quaglin halted the grievance procedure when he ceded complaints to his attorney.

As to any suggestion that Quaglin has been prevented from speaking out publicly or prevented from getting his message to Congress, NNRJ Policy P-01, Inmate Access to Media, sets forth that it is NNRJ's policy "to provide for and allow any inmate who chooses to contact and participate with the general public media." (Ex. 25, Policy P-01) The procedure requires the submission of a signed Media Release Form, wherein the inmate can agree to an interview, and whether he agrees to be photographed and/or recorded. (*Id*.) In addition, if a request is submitted by a federal inmate, the USMS must approve it. (Ex. 26, USMS Directive). There is no record of Quaglin's having submitted a Media Release Form. (Ex. 12, Hull Aff.)

Nothing in the record before the Court supports Quaglin's feeble claim that Superintendent Hull retaliated against him for exercising his First Amendment rights.

**F.  Quaglin is not entitled to a preliminary injunction mandating his release.**

Quaglin cannot make the showing required for injunctive relief, as he cannot establish any of the four factors: (1) a likelihood of success on the merits; (2) that irreparable harm will result in the absence of an injunction;  (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest.  *Winter*, 555 U.S. at 20.

As a threshold matter, Quaglin has failed to satisfy the PLRA's exhaustion requirement. Even if allowed to proceed, as discussed above, he has an exceedingly low likelihood of succeeding on the merits of his constitutional claims against Superintendent Hull.  Further, Quaglin will not suffer irreparable harm if denied injunctive relief.  His primary concerns appear to be treatment for celiac disease and access to counsel. The record reflects the high level of medical care and attention which medical personnel and NNRJ administration has and continues to provide to him.  And as to Quaglin's access to counsel, he continues to have access through telephone calls, written communication, and in-person visitation.

The final two factors that the Court must consider are the balance of equities and the public's interest in the issuance of an injunction. *See Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 821, 387 U.S. App. D.C. 346 (D.C. Cir. 2009). When "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citations omitted). Additionally, "courts of equity should [have] particular regard for the public consequences in employing the  extraordinary remedy of injunction." *Id.* (internal quotation marks and citations omitted).

The balance of equities here tips in favor of Superintendent Hull and against Quaglin, and an injunction compelling Quaglin's release is not in the public interest.  Quaglin was arrested on charges under 18 U.S.C. 231(a)(3) (Certain Acts during Civil Disorder), 18U.S.C. 111(b) (Assaulting, Resisting, or Impeding Certain Officers or Employees While Using a Deadly or Dangerous Weapons, and 18 U.S.C. 1512(c)(2) (Obstruction of an Official Proceeding), stemming from his role in the insurrection at the U.S. Capitol on January 6, 2021. The public has a significant interest in detaining Quaglin while his criminal case proceeds.  As the Circuit Court stated in affirming the trial court's Pre-trial Detention Order in Quaglin's criminal case, *United States v. Quaglin*, 851 Fed. Appx. 218 (D.C.Cir. June 24, 2021):

> [A]ppellant has not demonstrated that the district court clearly erred in finding that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community… As shown in video recordings and social media posts proffered by the government, appellant admitted to participating in violence in furtherance of his political beliefs in the months leading up to January 6, 2021. In addition, prior to January 6, appellant made plans to participate in violent conduct at the Capitol on that date, and he encouraged others to join him in that conduct (and to plan for violence and to bring weapons). During the incident itself, appellant shoved and struck multiple police officers outside the Capitol, and he discharged MK-9 OC spray at police officers, including directly into the unprotected face of one officer. Appellant was also on the front line of a group of individuals attempting to violently force their way inside the Capitol by physically overcoming a defensive line of police officers. In the aftermath of the incident, appellant posted videos to social media accounts celebrating his role in the violence. Furthermore, the district court did not clearly err in concluding that appellant's social_media posts suggest that he is affiliated with and has communicated with the Proud Boys, many of whose members have also been indicted for participating in violence on January 6.

*Id*. at 219 (internal citation omitted).

Where Quaglin cannot establish any one of the four factors that would support a preliminary injunction, the request for injunctive relief that would lead to his release should be denied.

**G.  Quaglin offers no basis for declaratory relief.**

In his Prayer for Relief, Quaglin requests that the Court grant the Writ and declare that he is being held in violation of the Fifth, Sixth, and Fourteenth Amendments to the Constitution. Petition, ¶ 203.  His request for declaratory relief is subject to dismissal.  It is "duplicative" of his substantive claims against Superintendent Hull and it "would be mooted by disposition" of those claims. *Boone v. MountainMade Found.*, 684 F. Supp. 2d, 1, 12, (D.D.C. 2010) (denying request for declaratory judgment where relief sought duplicated claim and would be mooted by claim's disposition).

## IV.   Conclusion

For the reasons set forth above, Superintendent Ted Hull respectfully requests this Court to deny Quaglin's Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief, with prejudice.

SUPERINTENDENT TED HULL

By: _____/s/_____
                            Of Counsel

Jeff W. Rosen, Esq., D.C. Bar No. 383153
PENDER & COWARD, P.C.
222 Central Park Avenue, Suite 400
Virginia Beach, VA 23462
Phone: (757) 490-6253
Fax:    (757) 497-1914
jrosen@pendercoward.com
*Counsel for Hull*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this this 7th day of June, 2022, I will electronically file the foregoing ***Respondent Ted Hull's Response to Petition for Writ of Habeas Corpus Under 28 U.S.C. 2241 and Complaint for Declaratory and Injunctive Relief*** with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) to the following:

Joseph D. McBride, Esq. (NY Bar #0403)
THE MCBRIDE LAW FIRM, PLLC
99 Park Avenue, 6th Floor
New York, NY 10016
Phone: (917) 757-9537
jmcbride@mcbridelawnyc.com
*Counsel for Petitioner*

Stephanie R. Johnson, Esq. (D.C. Bar #1632338)
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7874
Stephanie.Johnson5@usdoj.gov
*Counsel for Garland*


                    /s/
Jeff W. Rosen, Esq., D.C. Bar #383153
PENDER & COWARD, P.C.
222 Central Park Avenue, Suite 400
Virginia Beach, VA 23462
Phone: (757) 490-6253
Fax:    (757) 497-1914
jrosen@pendercoward.com
*Counsel for Hull*