## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF THE DISTRICT OF COLUMBIA

———————————————————————— )
                                                           )
UNITED STATES,                                             )
                                                           )
        v.                                                 )        Civ. No. 22-cv-01154 TNM
                                                           )
CHRISTOPHER  JOSEPH  QUAGLIN,                               )
        Defendant.                                         )
———————————————————————— )

## DEFENDANT'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR AN EMERGENCY HEARING

Comes now Petitioner Christopher Quaglin, by counsel, and moves the Court to order a preliminary injunction, ordering Petitioner released from pretrial confinement to the custody of his wife, on conditions suitable to the Court.  The urgency of the situation cannot be understated.  The Court must act swiftly to review this motion and order his immediate release, as Mr. Quaglin is in imminent danger of severe bodily harm or death.

## BACKGROUND

Petitioner has been detained without trial and without bail for over sixteen (16) months since April of 2021.  His trial was scheduled for October 3, 2021 but at a status conference on August 8, 2022, it was brought to the Court's attention that Petitioner's undersigned counsel was recently diagnosed with a chronic illness and accordingly requested a continuance, which the Court granted.  A new trial date has not been scheduled, but it is anticipated that the trial will take place sometime in April of 2023.

Over the last 16 months of confinement, Petitioner has been hauled around to six different facilities and at each facility subjected to inhumane conditions and gross violations of his civil and human rights.  *See generally* ECF No. 2.

Petitioner is currently detained in solitary confinement at Northern Neck Regional Jail ("NNRJ" of the "Jail"), in Warsaw, Virginia, under the direction of Respondent Superintendent Ted Hull.

Petitioner has made it clear to the Jail on countless occasions that he has celiac disease, a serious medical condition, and that the ingestion of gluten or gluten-contaminated food could lead to grave illness or even death. *See, e.g.,* Exhibit A, Declaration of Christopher Quaglin, ¶¶ 4-16. The Jail has persistently refused to comply with Petitioner's essential dietary needs and has served him food trays that were either gluten contaminated or that contained actual gluten ingredients. *See,* ECF No. 2 ¶¶ 77-81, Exhibit A ¶¶ 4-16.  As a result, Petitioner has suffered serious medical injuries from ingesting gluten-contaminated food and has lost over forty-five (45) pounds - ten pounds in the last two weeks alone - from refusing to eat the gluten-contaminated food provided to him by the Jail.  *See* Exhibit A ¶ 14.  Petitioner has suggested that the Jail obtain a neutral third party to provide gluten-free meals since the Jail is either unable or unwilling to ensure that the food provided does not contain gluten and is not gluten-contaminated. Exhibit A ¶ 16.  The Jail has consistently refused to consider this reasonable accommodation.  *Id.*  As a result, Petitioner has subsisted by purchasing the only gluten-free food available to him, gluten-free protein bars for sale in the Jail commissary. Exhibit A ¶ 13.

For "medical reasons" Petitioner has been placed in solitary confinement.  Exhibit A ¶¶ 19-29.  All day he is locked in a windowless room with no human contact and with no staff or cameras to monitor his safety.  *Id.*  The sporadic "medical treatment" consists only of staff periodically peering at him through the door.  He has not been sufficiently examined by a doctor or other health care practitioner since he was moved to "medical."  Exhibit A ¶¶ 30-32.  The Jail is allowing him to wither away to the point that he fears for his very life.  Exhibit A ¶ 39.

To make an already untenable situation worse, the Jail has recently punished Petitioner by revoking his ability to purchase commissary food. Exhibit A ¶¶ 34-38. If this persists much longer, Petitioner will starve to death. Petitioner and undersigned counsel have consistently rung the alarm by seeking every available remedy to alleviate the dire situation before it came to this life-threatening crisis.

## LEGAL STANDARD

A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (quoting *Winter*, 555 U.S. at 20)) (quotation marks omitted). "When seeking a preliminary injunction, the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

In the D.C. Circuit, the four are evaluated on a "sliding scale." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (2009) (citing *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)). If the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor. *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (2009) (quoting *City Fed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)) ("If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."). For

example, if the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success. *See, e.g., WMATC v. Holiday Tours*, 559 F.2d 841, 843 (D.C. Cir. 1977). Alternatively, if substantial harm to the non-movant is very high and the showing of irreparable harm to the movant very low, the movant must demonstrate a much greater likelihood of success. It is in this sense that all four factors "must be balanced against each other." *Davenport*, 166 F.3d at 361. When seeking a preliminary injunction, the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (2006).

## ARGUMENT

### I.   PETITIONER IS LIKELY TO SUCCEED ON THE MERITS.

Petitioner's likelihood of success on the merits is dependent upon the strength of his constitutional challenges to NNRJ's treatment under the direction of Superintendent Hull. *Cf. Mills*, 571 F.3d at 1308. Petitioner's obvious observable decline in health since he has been at NNRJ is the strongest evidence in support of Petitioner's case and presents a high likelihood that he will succeed on the merits of his claims of deliberate indifference to his serious medical condition in violation of his civil and human rights. Since he arrived at NNRJ under Superintendent Hull's custody, Petitioner has lost over 45 pounds – ten pounds in the last 2 weeks. Ex. A ¶ 14. The loss of weight is due to Superintendent Hull's failure to provide certified gluten-free meals for Petitioner. *Id.* When Petitioner ate the meals provided to him, he experienced symptoms associated with ingestion of gluten contaminated food. Ex. A ¶¶ 10-11. He brought all of this to the attention of the staff, but the staff made no efforts to accommodate him. *Id.* Other courts have considered celiac disease a "serious medical condition" and the failure to provide a gluten-free diet as "deliberate indifference." *See, e.g.*, *Jamison v. Clarke*, Civil Action No. 7:18-

cv-00504, 2021 U.S. Dist. LEXIS 48086 (W.D. Va. Mar. 15, 2021); *Watson v. Wash. Dep't of Corr.,* No. C17-5968-BHS-TLF, 2018 U.S. Dist. LEXIS 220412, at *8 (W.D. Wash. Nov. 15, 2018); *Nave v. Fuhrman,* No. 4:12cv225-MP/CAS, 2014 U.S. Dist. LEXIS 158675, at *32 (N.D. Fla. Sep. 11, 2014); *Devine v. Ryan,* No. CV-18-04286-PHX-MTL (MTM), 2021 U.S. Dist. LEXIS 138037, at *33-35 (D. Ariz. July 23, 2021).

On this record, a reasonable jury could find that Petitioner's Eighth Amendment rights were violated where the evidence shows that Petitioner had a documented diagnosis of celiac disease for which he was prescribed a gluten-free diet; Jail officials, including Superintendent Hull, were well aware of his diagnosis; Petitioner repeatedly informed the staff that he was being provided gluten that he could not eat; Petitioner offered a reasonable accommodation which would ensure the food he received was certified gluten-free; but despite it being documented that he was rapidly losing weight as a result of not eating the food, the Jail failed to explore any reasonable accommodations to resolve the issue. It is well-established in the record that several medical staff members and officials were aware of Petitioner's diet issues, yet no acceptable procedure has been implemented in the 8 months since he arrived at the Jail. During this time, Petitioner lost a significant amount of weight – 45 pounds, 10 pounds in the last two weeks. These facts are more than enough to show that officials were aware of Plaintiff's serious medical condition and showed deliberate indifference.

He is currently locked in what is effectively solitary confinement – regardless of what NNJR official calls it – and has not been examined by a doctor. Ex. A ¶¶ 20-29. He is not monitored by a camera or by the staff on any regular basis. *Id.* He is being left to wither away. Ex. A ¶ 39.

Petitioner also alleges several violations of his Fifth, Sixth, and Eighth Amendment Rights. *See generally,* ECF No. 2, at pages 49-59. The email correspondences between Petitioner's counsel and Superintendent Hull demonstrate that Superintendent Hull feels animus and contempt for Petitioner, to the point that Superintendent Hull shamelessly admits to violating Petitioner's rights.

Petitioner alleges generally that Superintendent Hull has stubbornly and unlawfully refused to recognize that Petitioner is a pretrial detainee, not a convicted inmate, - *see, e.g.,* ECF No. 2 ¶¶ 91-92, 93-94 - and as such, the Superintendent has allowed Petitioner to be subjected to unlawful punitive measures reserved for inmates. *See S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec*., Civil Action No. 18-760 (CKK), 2020 U.S. Dist. LEXIS 106416, at *59 (D.D.C. June 17, 2020) (quoting Y*oungberg v. Romeo*, 457 U.S. 307, 322 (1982)) ([P]re-trial detainees, are therefore "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."); *Hardy v. Dist. of Columbia*, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) ("While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment [under the Eighth Amendment], a [civil] detainee, not yet found guilty of any crime, may not be subjected to punishment of any description.").

On numerous occasions, Petitioner's counsel has reminded Superintendent Hull that Petitioner is not an inmate and should be treated accordingly, but Superintendent Hull persistently flaunted the law in emails and in practice by continuing to unlawful punish Petitioner, even inviting undersigned counsel to bring the matter to the Court. *See* ECF No. 2 ¶¶ 91-92. By way of example, on March 28, 2022, Petitioner's counsel wrote to Superintendent Hull, "For the 100th time, Mr. Quaglin is a DETAINEE, and you are NOT to treat him like an inmate." To which Superintendent Hull responded, "Then sue me. INMATE Quaglin is receiving everything he is supposed to and

he is being treated consistent with his behavior and the specific requirements of his situation." *Id.* (emphasis in original).  This bizarre insistence in erroneously referring to Petitioner as an "INMATE" is more than mere semantics; it demonstrates that Superintendent Hull does not differentiate between the convicted prisoners and the innocent-until-proven-guilty detainees.  The failure to make this crucial distinction, compounded by Superintendent Hull's vindictive tone, are *prima facie* evidence that Superintendent Hull acted vindictively and illegally by punishing Petitioner, as Petitioner alleges.  This unlawful treatment is not an isolated incident; it is systemic. Superintendent Hull has demonstrated that he either cannot or will not follow or even acknowledge the law, and the only remedy is Petitioner's release.

Petitioner has not been provided his discovery materials in violation of his Fifth and Sixth Amendment rights since he arrived at NNRJ over 8 months ago.  Ex. A, ¶ 19.  Superintendent Hull has been made aware of that fact and has done nothing about it.  As late as March 28, 2022, after Petitioner had been detained for over 3 months without being provided his discovery, Superintendent Hull acknowledged the violation of Petitioner's right to see his discovery, and wrote, "I will check on discovery."  ECF No. 2 ¶ 92.  Now, five months later, Petitioner has still not seen his discovery.

Superintendent Hull has unlawfully punished Petitioner by denying Petitioner access to the video conferencing system to meet with Petitioner's counsel, thus violating Petitioner's constitutional right to access to counsel and to meaningfully participate in his defense.  When Petitioner's counsel demanded that access be reinstated, Superintendent Hull responded by admitting that the denial was a punishment: "You HAVE abused the video visitation system and it is a privilege not a right.......take Inmate Quaglin's call or drive here and visit with Inmate Quaglin."  ECF No. 2 ¶ 92.  As Superintendent Hull has refused to provide Petitioner with the

discovery materials delivered to the Jail by his attorney, Petitioner has an absolute right to communicate via video conference so that he can at the very least view his discovery in a limited manner through the video screen. *See S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 U.S. Dist. LEXIS 106416, at *104 (D.D.C. June 17, 2020) (finding that pretrial detainees have a right to "orderly and fair" access to video conference with counsel). The Jail has also failed to provide a laptop or tablet to view his discovery, as is done in other facilities. *See id.*

The evidence weighs in favor that Petitioner is likely to succeed on the merits of at least one of his civil rights allegations that will be sufficient for release.

## II.    PETITIONER IS LIKELY TO SUFFER IRREPERABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF.

It is indisputable that Petitioner will suffer irreparable harm in the absence of preliminary relief. Even if Superintendent Hull is to argue falsely that Petitioner, not the Jail, is responsible for his drastic decline in health, he cannot argue that Petitioner's health is in drastic decline. Celiac disease is a serious condition and can lead to serious bodily harm or death. Petitioner is terrified to eat the food provided by the Jail. He is forced to subsist on protein bars purchased at the commissary, but his commissary access has been cut off. If his current conditions of confinement continue, he will run out of food in a matter of days. Even if the Jail were to reinstate his commissary access, Petitioner is still subsisting on protein bars, which is not a healthy diet, and given his already serious medical condition, he is likely to suffer irreparable bodily harm if this situation is allowed to continue.

Additionally, Petitioner is in what is effectively solitary confinement, despite the Jail's insistence on calling it by another name. This abusive practice is known to cause long-term psychological damage. *See Porter v. Clarke*, 923 F.3d 348, 356 (4th Cir. 2019) (*"*Based on this

extensive body of literature, scholars have concluded that 'solitary confinement has potentially serious psychiatric risks.' J.A. 1042 (quoting Pizarro & Stenius, *supra* at 256); *see also* Br. *Amici Curiae* Profs. & Practitioners of Psychiatry & Psychology in Supp. of Pls.—Apps. and Affirmance ("Amici Br.") at 8-9 ("Scientific research, regardless of methodology, has produced strikingly consistent results: the deprivation of meaningful social contact and positive environmental stimulation characteristic of solitary confinement subjects prisoners to grave psychological and physiological harms." (internal quotation marks omitted))").

Petitioner is further harmed in that under such physically and psychologically oppressive conditions, it is impossible for him to adequately prepare for trial, even if he had his discovery materials. *United States v. Ali,* 965 F. Supp. 2d 139, 151-52 (D.D.C. 2013) (citing *Barker v. Wingo*, 407 U.S. 514, 520, 533 (1972)) ("a pretrial detainee generally is 'hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense." *Id.* at 533 … Moreover, the physical and psychological toll of pretrial detention, particularly a detention lasting for several years, where the defendant is effectively cut off from everyone but his attorneys, can significantly affect a defendant's ability to participate in his own defense. *Cf. id.* at 520 ("Lengthy exposure to these [pretrial detention] conditions 'has a destructive effect on human character. . . .'")). Continued detention under these conditions will prejudice Petitioner in his defense and could lead to irreparable harm in the form of an unfavorable outcome at trial.

Additionally, Petitioner leaves at home his wife Moira and his infant son Nathan.  He was arrested and detained when his son was just eight weeks old and Petitioner has not seen Nathan since his arrest 16 months ago. Ex. A ¶ 3.  This is psychologically harmful not only to Petitioner, but also to his wife and infant son. Moira Quaglin is a nurse by profession and works intensive shifts every Saturday, Sunday, and Monday.  The rest of the week she stays home and cares for

Nathan.   During Petitioner's incarceration, Moira has depended on her father who lives nearby and watches Nathan while she is at work.  Ex. A ¶ 3.  On August 16, 2022, her father suffered a tragic accident and broke his neck.  Ex. A ¶ 40.  He underwent life-saving surgery and is currently in the hospital. *Id.* This unexpected tragedy, even under normal circumstances, would be a devastating hardship to any family. Moira now must care for infant son as a single mother without the support of her husband or her father.  The family will continue to suffer harm as long as Petitioner is detained.

This constitutes irreparable harm that weighs heavily in Petitioner's favor.

## III.    THE BALANCE OF EQUITIES TIPS IN PETITIONER'S FAVOR.

The balance of equities weighs entirely to the Petitioner's side.  Superintendent Hull suffers no harm if Petitioner is released and has no interest in Petitioner's confinement.  NNRJ is only housing Petitioner pursuant to an intergovernmental agreement with USMS, and only because Judge Royce Lamberth found the conditions of confinement in Washington DC where Petitioner was previously confined to be deplorable and violative of Petitioner's civil rights.  Petitioner is not from Virginia and is not accused of committing a crime in Virginia.  Superintendent Hull is only responsible for housing and caring for Petitioner; it makes no difference to him whether Petitioner is detained or released.

If anything, Superintendent Hull has an interest in releasing Petitioner as he and NNRJ are apparently incapable of properly caring for Petitioner's health, as demonstrated by the fact that he is drastically losing weight and his health is in steady decline.  The Jail maintains he is held in solitary confinement for the good of his health, but even if true, if the Jail truly cared about his health, they would advocate for his release to his wife who is a nurse with extensive experience in providing a certified gluten-free diet that Petitioner will eat.

On the other side of the scale balancing the equities, Petitioner is withering away and starving in solitary confinement without adequate medical care. He is left with the impossible choice of either starving or eating food that could cause him serious bodily harm or death. This is an untenable situation and demands immediate release. *Cf. United States v. Dabney*, No. 20-cr-27 (KBJ), 2020 U.S. Dist. LEXIS 67127, at *4 (D.D.C. Apr. 13, 2020) ("In this Court's view, having an underlying medical condition that could heighten a defendant's risk of harm during the period of pretrial detention has a 'material bearing' on the required detention determination.").

If Superintendent Hull argues that Petitioner is exaggerating his plight so that he can be released to his wife and infant child, and Petitioner should remain incarcerated to protect the public from Petitioner, it should be noted that the Government's argument for detention was that Petitioner, an electrician from New Jersey with no criminal history, was so dangerous that "it is difficult to fathom a more serious danger to the community — to the District of Columbia, to the country, or to the fabric of American Democracy" than Petitioner. *United States v. Quaglin*, Case No. 1:21-cr-40 ("Criminal Case"), ECF No. 8, ¶ 59. Unlike the Government's hysterical hyperbole, Petitioner's plight is real, and the threat of serious harm is not an exaggeration. During his detention he has lost forty-five pounds - ten in the last two weeks. The months of long detention and deliberate indifference to his serious medical condition have taken a great toll.

The Government admitted that "the defendant has no prior convictions and limited prior contacts with law enforcement. All of which weighs in favor of release. In addition, his steady housing and community connections weigh in favor of release." *Id.* ¶¶ 53-54. The Government never argued that Petitioner posed a flight risk. *Id.* To the extent that he posed any threat to the safety of the community or to the "fabric of American Democracy" in April of 2021, today after

16 months of detention under terrible conditions, even the Government must concede that he poses

no such threat.

Given that Superintendent Hull has no interest in detaining Petitioner, and on the other side

of the scale Petitioner's has a grave interest in his release, the balance of equities weighs entirely

in favor of Petitioner.

## IV.    INJUNCTION IS IN THE PUBLIC INTEREST.

The continued prolonged detention of Petitioner is against the public interest as the

extensive length of his detention is a violation of his civil rights and protecting civil rights is "a

purpose that is always in the public interest." *Dodds v. U.S. Dept. of Educ.*, 845 F.3d 217, 222 (6th

Cir. 2016).

Petitioner has been detained without trial for 16 months in violation of his due process rights.

Pretrial detention violates due process when it "become[s] excessively prolonged, and therefore

punitive," rather than regulatory. *United States v. Salerno*, 481 U.S. 739, 747-48 & 747 n.4 (1987).

The length of pretrial detention is excessive when it is no longer related to its regulatory purposes,

including protecting the public from dangerous defendants and ensuring that they will not flee.

*United States v. Torres*, 995 F.3d 695, 709-10 (9th Cir. 2021). There is no set time when pretrial

detention crosses the line from regulatory to punitive because due process is a flexible concept

and, thus, its limits depend on the facts of the case. *United States v. Zannino*, 798 F.2d 544, 547

(1st Cir. 1986).

Courts consider six factors when evaluating whether the length of pretrial detention

violates due process: (1) the seriousness of the charges; (2) the strength of the government's proof

that the defendant poses a risk of flight or a danger to the community; (3) the strength of the

government's case on the merits; (4) the length of the detention; (5) the complexity of the case;

and (6) whether the strategy of one side or the other has added needlessly to that complexity.

*United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986); *see also United States v. Hare*, 873 F.2d 796, 801 (5th Cir. 1989); *United States v. Ojeda Rios*, 846 F.2d 167, 169 (2nd Cir. 1988); *United States v. Zannino*, 798 F.2d 544, 547 (1st Cir. 1986) (same); *United States v. Theron*, 782 F.2d 1510, 1516 (10th Cir. 1986).  In some cases, the evidence admitted at the initial detention hearing, evaluated against the background of the duration of pretrial incarceration and the causes of that duration, may no longer justify detention.  *Accetturo*, 783 F.2d at 388.

Beginning with the length-of-detention factor, it is worth noting, as a guidepost, that the First Circuit has expressly stated "we shall assume that in many, perhaps most, cases, sixteen months would be found to exceed the due process limitations on the duration of pretrial confinement." *Zannino*, 798 F.2d at 547-48.  In *Zannino,* "the charges against Zannino are of the gravest order, including predicate acts of murder and conspiracy to commit murder. If convicted of all offenses charged, Zannino would face a maximum sentence of imprisonment for 130 years." The government's case on the merits was found to be strong, and he was found to be dangerous. The court also found Zannino to have "played a continuing leadership role in mob activities." With all that, the Court found that 16 months would have been unconstitutionally excessive for pretrial detention, but for the fact that it was Zannino who had delayed his trial, and not the government.

The Second Circuit condemned as unconstitutionally excessive the fourteen-month (14) detention of two defendants charged with participating in the robbery of a Wells Fargo depot by paramilitary Puerto Rican nationalists. *United States v. Gonzales Claudio*, 806 F.2d 334, 343 (2d Cir. 1986).  The Ninth Circuit has recently stated that a twenty-one-month detention is "significant under any metric and is deeply troubling," when the defendant was a five-time convicted violent drug dealer, caught with an outstanding warrant, a gun with live ammunition, and 64 grams of methamphetamine. *Torres*, 995 F.3d at 709.

Courts not only consider the time already spent in detention, but also "the non-speculative nature of future detention," *i.e.,* the time until trial, and the length of the trial.  *See Hare*, 873 F.2d at 801; *see also Ojeda Rios*, 846 F.2d at 168-69.  In *Ojeda Rios*, the Second Circuit ordered the release of the defendant even though the district court found that the defendant "posed a risk of flight and also presented a danger to the community," because after considering the length of his confinement *and the fact that the trial was anticipated to take months*, the court found "we do not believe that due process can tolerate any further pretrial detention in this case."

Petitioner has been detained for 16 months solely on the basis of certain alleged acts captured on video during the riot at the Capitol on January 6.  He has no prior criminal history and there is no evidence that he poses a flight risk. If Petitioner's alleged offenses were committed in a vacuum, there is no doubt that he would have been granted release upon arrest, and in fact U.S. Magistrate Judge Zahid Nisar Quraishi in the District of New Jersey saw fit to release him before the Government appealed the release order.  The Government admitted that "the defendant has no prior convictions and limited prior contacts with law enforcement. All of which weighs in favor of release. In addition, his steady housing and community connections weigh in favor of release." The Government never argued that Petitioner posed a flight risk, the entire argument for his detention was based on their assertion that his involvement in the January 6th riot and some of his social media posts and text messages showed that there was a danger to the safety of the community.  *See generally* Criminal Case, ECF No. 8.  Even if all of the government's allegations are taken as true, Courts have considered 16 months of pretrial detention to be unconstitutional for defendants charged with far more dangerous crimes and with prior criminal history.

On the other hand, any one of the serious violations of civil and human rights set forth in the Petitioner at bar, if found to be true, itself justify Petitioner's immediate release, all the more so, the multitude of violations combined.

As the public has an interest in ensuring the civil and human rights of its citizens, it is in the public's interest to release Petitioner.

## CONCLUSION

For the aforementioned reasons, the Court should grant this Emergency Motion for Preliminary Injunction and Order Petitioner released from pretrial confinement to the custody of his wife, subject to conditions to be determined by the Court.

Dated: Washington, DC
August 23, 2022

Respectfully submitted,

/s/ Joseph D. McBride, Esq.
Bar ID:  NY0403
THE MCBRIDE LAW FIRM, PLLC
99 Park Avenue, 6th Floor
New York, NY 10016
p: (917) 757-9537
e: jmcbride@mcbridelawnyc.com
*Counsel for the Defendant*

## REQUEST FOR AN EMERGENCY HEARING

Petitioner requests that the Court schedule an emergency hearing on this motion on August 24, 2022 or as soon as possible thereafter.

/s/ Joseph D. McBride, Esq.

14

<u>Certificate of Electronic Service</u>

I hereby certify that on August 10, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, with consequent service on all parties.

<u>/s/ Joseph D. McBride, Esq.</u>