**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF THE DISTRICT OF COLUMBIA**

_____

CHRISTOPHER JOSEPH QUAGLIN,    )
     Petitioner    )
               )
    v.    )    Civ. No. 22-cv-01154 TNM
               )
MERRICK GARLAND, ET AL.,    )
     Respondent    )

_____ )

## PETITIONER'S OPPOSITION TO RESPONDENT TED HULL'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT AND REQUEST FOR A HEARING

Comes now Petitioner Christopher Quaglin, by counsel, with this Opposition to Respondent Ted Hull's Motion for Summary Judgment.

### I.   BACKGROUND

Christopher Joseph Quaglin is a United States citizen, currently held at Northern Neck Regional Jail ("NNRJ"), in Warsaw, Virginia.  Mr. Quaglin is a federal pretrial detainee, not an inmate, contrary to the assertion of Respondent Superintendent Ted Hull. Petitioner's constitutional and human rights are regularly violated at NNRJ.  Petitioner alleges that his serious underlying medical condition – celiac disease – has been treated with deliberate indifference, which has caused him to suffer irreparable harm. Petitioner has been moved to six different jails since first being detained in April of 2021, and the malicious indifference to his medical condition intensifies after each move.

Petitioner further alleges that he has been repeatedly punished and subjected to prolonged solitary confinement for punitive reasons.  Petitioner alleges that he has been forced to live, sleep,

and eat in disgusting unsanitary living conditions where there is black mold, rats, and roaches. Insect and rat droppings are routinely found on his food trays, and that he has been forced to drink brown and/or black-looking water.  Petitioner alleges that he has been and continues to be purposefully housed in notoriously hostile parts of the jail for the specific purpose of exposing him to violence and causing him to live in a constant state of fear of being murdered.  Petitioner further alleges that he was put into a section of NNRJ where violent gang and cartel members are housed. Consequentially, he was assaulted so badly that he received eight stitches next to his right eye. Petitioner alleges that he is routinely denied access to necessities such as toiletries, medicine, food, and natural light.  That he has never seen the discovery in his case despite being detained for over one year. That his attorney-client privileged calls are repeatedly spied on and monitored. That reasonable access to his attorneys has been routinely and maliciously interrupted. And that each time Petitioner complains about his inability to meaningfully participate in his defense, additional punitive measures are taken to intimidate, silence, and harm him.

## I.   PROCEDURAL HISTORY

On April 26, 2022, Petitioner filed a Writ of Habeas Corpus seeking immediate release from the Northern Neck Regional Jail where Respondent Ted Hull is the Superintendent, naming Ted Hull and United States Attorney General Marrick Garland as Respondents.  ECF No. 2. Garland filed a Motion to Dismiss (ECF No. 20) which was granted by the Court in an Order dated August 16, 2022, dismissing Garland as a Respondent (ECF No. 25).

On June 7, 2022, Respondent Hull filed an Answer to the Complaint and Respondent Ted Hull's Response to Petition for Writ Of Habeas Corpus Under 28 U.S.C. 2241 And Complaint for Declaratory and Injunctive Relief (the "Response").  ECF No. 17.  On July 23, 2022, the Court

issued a Minute Order stating that the Court, *sui sponte*, would construe the Response as a Motion

to Dismiss instead of as an Answer (docket entry 06/23/2022), but then on August 16, 2022, the

Court issued a subsequent Order stating it would instead construe the Response as a Motion for

Summary Judgment instead of as a Motion to Dismiss (ECF No. 25).

## II.   STATEMENT OF MATERIAL FACTS

Respondent Hull's Response violates this Cout's Local Rule 7(h) as it is not accompanied

by a statement of material facts.  "This circuit has long upheld strict compliance with the district

court's local rules on summary judgment when invoked by the district court." *Burke v. Gould*, 286

F.3d 513, 517, 351 U.S. App. D.C. 1 (D.C. Cir. 2002).  As a consequence, the Court should deem

all material facts alleged in the Petition as admitted other than those few material facts directly

contradicted in the Response by supporting admissible summary judgment evidence.  *Jackson v.*

*Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154, 322 U.S. App. D.C. 35

(D.C. Cir. 1996) (holding that district court may deem facts that do not comply with Rule 56(e) or

the local rule as admitted because "the district court is under no obligation to sift through the record

. . . in order to evaluate the merits of that party's case"); *cf. Austin Inv. Fund, LLC v. United States*,

Civil Action No. 11-2300 (CKK), 2015 U.S. Dist. LEXIS 156312, at *35-36, 116 A.F.T.R.2d

(RIA) 2015-6828 (D.D.C. Nov. 19, 2015) (penalizing a non-moving party in a motion for summary

judgment that failed to comply with Local Rule 7(h) by assuming that all of the facts identified in

the moving party's statement of material facts were admitted as true).  *See also* Fed. R. Civ. Pro.

8(b)(6).

This is fair considering the unusual history of the pleadings in this case.  Respondent Hull

initially filed his Response as an Answer, but, as the Response was in flagrant violation of Federal

Rule 8, the Court, *sui sponte*, gave the Respondent a second bite at the apple by converting the Response into a Motion to Dismiss.  Subsequently, when the Response failed as a Motion to Dismiss, the Court, once again *sui sponte*, gave Respondent Hull a third bite at the apple by converting the Response into a Motion for Summary Judgment.  Accordingly, all material facts in the Petition must be implicitly admitted by Respondent, because if he denies a material fact, then there exists a genuine issue of material fact and Summary Judgment cannot be granted.

Based only on the facts alleged in Hull's Response, and deeming as admitted all facts alleged in the Petition that Hull does not directly contradict in the Response based on admissible supporting evidence, the following is a concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated:

1. Petitioner exhausted his remedies prior to filing his Petition.  This is supported by evidence submitted by Hull that Petitioner engaged in the full appeal process to no avail.  *See* ECF No. 17 at 7 ("Quaglin only appealed one Grievance, No. 22-059, against the kitchen, to the Major and then to the Superintendent, as recorded in the Major's Grievance Appeal Log and the Superintendent's Grievance Appeal Log.").  This is also supported by the fact that Hull as superintendent expressly instructed the staff and Petitioner's counsel that with respect to Petitioner the grievance process would be bypassed and all grievances would go directly to Hull.  *See* ECF No. 2-4 ("Yes…by my direction all calls requests inquiries or other communication about or associated with inmate Quaglin, are being forwarded to me."); *see also* ECF No. 17-15 at 51 (describing the grievance process, "the decision of the Superintendent is FINAL!") (emphasis in original).

2. The grievance process is irreparably broken and an exercise in futility.  *See* Exhibit A, Quaglin Decl., ¶ 18; *see also* ECF No. 2-4 (objectively disturbing emails to counsel from

Hull, who is the final arbiter of all grievances and demonstrated that he could not be rational, fair, civil, or professional when dealing with Petitioner).

3. Petitioner has celiac disease and requires a strict gluten-free diet which means food provided must not contain gluten or be cross-contaminated with gluten.  Exhibit A, Quaglin Decl.  ¶¶ 4-7, 11-13.

4. Celiac disease is a serious medical condition and if not cared for properly it can lead to serious bodily harm or even death.  Exhibit A, Quaglin Decl.  ¶¶ 4-7, 11-13.

5. Respondent cannot guarantee that the food provided to Petitioner was free of gluten or of cross-contamination with gluten.  Hull provides no evidence to dispute this.

6. NNRJ does not and is incapable of providing Petitioner with an appropriate Gluten-Free diet.  A Gluten-free diet requires special training to ensure that there is no cross-contamination with gluten and NNRJ does not provide such training nor does it have any procedures to ensure that there is no cross-contamination with gluten.  Exhibit A, Quaglin Decl.  ¶¶ 4-7, 11-13.  Hull provides absolutely no evidence that the staff has special training, that the Jail has a special procedure for inmates with celiac disease, or that the food provided to Petitioner was not cooked with Gluten or otherwise cross-contaminated with gluten.

7. Petitioner was not provided adequate medical care.  This is obviously apparent from the drastic decline in Petitioner's health and weight.  *See, also* Exhibit A, Quaglin Decl. ¶¶ 14-23.

8. Petitioner's discovery materials were delivered to the DC Jail by Petitioner's counsel in September of 2021 and were received by the DC Jail.  *See* Exhibit B, emails confirming delivery of discovery to Jail; ECF No. 2-4, pages 2-3.

9.  As Petitioner's immediate custodian, Respondent Hull is accountable for failing to deliver Petitioner's discovery to Petitioner and thereby depriving Petitioner of his constitutional right to participate in his own defense.  *See* ECF No. 25 (holding that Respondent Hull is the proper respondent in a habeas challenge).

10. Respondent Hull has acknowledged that he is responsible for the failure to deliver Petitioner's discovery materials to Petitioner and that it is his responsibility to cure the failure by locating and delivering Petitioner's discovery materials to Petitioner.  *See* ECF No. 2-4, pages 2-3 (Hull stating "I will check on discovery.").

11. Respondent Hull has taken no action to provide Petitioner with his discovery materials. *See* ECF No. 17-12 ¶ 16.

12. Petitioner is placed in solitary confinement.  *See* Exhibit A, Quaglin Decl. ¶ 23 ("I am in a room by myself and I don't have any human contact for most of the day.").

13. Solitary confinement in all circumstances constitutes *de facto* punishment.  Hull did not submit evidence to dispute this.

14. Petitioner has been in prolonged solitary confinement.  Hull did not submit evidence to dispute this.

15. Prolonged solitary confinement is torture.  Hull did not submit evidence to dispute this.

16. Petitioner is unfairly punished.  *See, e.g.,* Exhibit A, Quaglin Decl. ¶ 35.

17. Petitioner is generally mistreated and retaliated against.  ECF No. 2-5.

18. Petitioner is unlawfully punished as a convicted inmate and not treated pursuant to his rights as a pretrial detainee. *See* ECF No. 2-4 (Hull's refusal to acknowledged Petitioner's legal status as a pretrial detainee); ECF No. 2-5.

### III.   LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson,* 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.   To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

## IV.   ARGUMENT

**A. SUMMARY JUDGMENT SHOULD BE DENIED TO HULL BECAUSE IT WOULD BE MANIFESTLY UNJUST TO REQUIRE THE PETITIONER TO PROCEED IN A SUMMARY JUDGMENT MOTION IN WHICH THE MOVANT'S NON-COMPLIANCE HAS SO SEVERELY PREJUDICED PETITIONER'S ABILITY TO RESPOND.**

Respondent Hull's Response violates This Cout's Local Rule 7(h) as it is not accompanied by a statement of material facts.  This Court's Local Rule 7(h) states:

> Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement. An opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement.

*Id.*  When a movant for Summary Judgment fails to follow this essential rule "it would be manifestly unjust to require the non-movant to proceed in a summary judgment motion in which the movants' non-compliance has so severely prejudiced his ability to respond as the Local Rules require." *Jackson v. Broome Cty. Corr. Facility*, 194 F.R.D. 436, 437 (N.D.N.Y. 2000). "This circuit has long upheld strict compliance with the district court's local rules on summary judgment when invoked by the district court." *Hawkins v. District of Columbia*, No. 17-cv-1982 (DLF), 2020 U.S. Dist. LEXIS 21317, at *11 (D.D.C. Feb. 7, 2020).  *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002).

To fully understand why it is in the interest of justice to deny Summary Judgment to the Respondent on this ground alone, it is worth recounting for the record how we arrived at this point, which is to say directly because of Respondent Hull's woefully deficient "motion."  Hull's counsel originally submitted the Response into the Court's electronic filing system as an "Answer," pursuant to Federal Rule of Civil Procedure 8, though in flagrant violation of the well-known

responsive numbered paragraph format required by Federal Rule 8(b).  It is abundantly evident that Hull intended for the filing to be an "Answer" and not a "Motion."

The Court's electronic docket indicates that Hull's counsel filed the Response as an "ANSWER" as opposed to as a "MOTION" as Hull's Co-Respondent Garland did.  *Compare* docket entry 06/07/2022 *with* docket entry 06/21/2022.  The Court may take judicial notice that the Court's electronic filing system has a very easy-to-use interface that clearly guides attorneys step-by-step on proper filing, and the process for filing an Answer to an initial pleading is entirely separate from filing a Motion to Dismiss, such that Hull's counsel cannot credibly claim that it was a clerical error.  The fact that Hull's counsel chose to file the Response as an ANSWER rather than as a MOTION indicates that Hull's counsel intended the Response to be a Rule 8 Responsive Pleading, not a Rule 12 Motion to Dismiss.

This conclusion is further supported by the fact that the Response was titled as a "Response to Petition for Writ of Habeas Corpus Under 28 U.S.C. 2241 and Complaint for Declaratory and Injunctive Relief" as opposed to as a "Motion to Dismiss," like co-Respondent Garland's filing, and as lawyers routinely do in almost all cases when filing motions to dismiss.  The conclusion is further supported by the fact that the Response does not include the Legal Standard for a Motion to Dismiss.

The strongest indication that indisputably demonstrates that the Response was not intended to be a Motion to Dismiss is that the Response does not ask the court to dismiss the Petition.  Federal Rule 12(b) provides that a party may assert certain defenses by motion, including: 12(b)(1) lack of subject matter jurisdiction; 12(b)(2) lack of personal jurisdiction; 12(b)(3) improper venue; 12(b)(4) insufficient process; 12(b)(5) insufficient service of process; 12(b)(6) failure to state a claim upon which relief can be granted; and 12(b)(7) failure to join a party under Rule 19.  By

contrast, an Answer under Rule 8(b) states, "In responding to a pleading, a party must state in short and plain terms its defenses to each claim asserted against it; and admit or deny the allegations asserted against it by an opposing party."  Hull's response does not argue any of the defenses in Rule 12, instead, the Response denies the factual allegations of the Petition.

The Court, *sui sponte*, issued an order that it would construe the incorrectly written Answer as a Motion to Dismiss, thereby giving Hull a second bite at the apple.  Hull seized that second bite with gusto in his Reply to Petitioner's Response to his Answer-turned-Motion-to-Dismiss.

> Per the Court's Order, Hull satisfied Fed. R. Civ. P. 12(b), having filed a Motion to Dismiss before a required responsive pleading. *See* Fed. R. Civ. P. 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed."). In addition, Petitioner erroneously titles his response to Hull as an "Opposition to Respondent Ted Hull's Response." As the Court's Order sets forth, Petitioner was required to file a Consolidated response to Respondents' Motions to Dismiss.

Hull then, improperly, made new arguments in his Reply Brief; he insisted that his Answer was actually a 12(b)(1) Motion to Dismiss.  But then the Court issued its second Order and converted the Motion to Dismiss into the Motion for Summary that is now before the Court.

This has been fundamentally unfair to Petitioner.  The Court's June 23, 2022 Order converted the Answer to a "Motion to Dismiss" without indicating what type, making it impossible for Petitioner to respond.  Petitioner assumed the Court meant a 12(b)(6) motion and responded accordingly, which allowed Hull to sidestep Petitioner's argument in his Reply by claiming that the Court meant a 12(b)(1) motion.

Now the Court asks us to respond to a Motion for Summary Judgment that violates one of the most essential rules.

> Our District's requirements are not empty formalities. Rules such as L.R. 7.1(a) "serve to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way -- thus facilitating its judgment of the necessity for trial." *Little v.*

*Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995). Each of these functions is vital. When a party fails to comply with these provisions it is unfair to its adversary, which has a right to know the factual bases of its opponent's case and the specific foundations for those assertions of fact; and its conduct is adverse to the conservation of judicial resources, which are most efficiently deployed when the parties fulfill their adversarial functions in a rigorously organized, coherent fashion.

*Jackson v. Broome Cty. Corr. Facility,* 194 F.R.D. 436, 437 (N.D.N.Y. 2000).

Respondent Hull had a chance to file an appropriate Answer—he failed.  Respondent Hull had a second chance at a Motion to Dismiss—he failed again.  Respondent Hull's Motion for Summary Judgment is, on its face, his third consecutive failure.  As such, his Motion for Summary Judgment should be denied, because there is no set of circumstances under which a third consecutive chance to cure a deficient pleading can be granted without prejudicing the Petitioner.

**B.  IN THE ALTERNATIVE, THE COURT SHOULD DENY RESPONDENT'S MOTION FOR SUMMARY JUDGMENT BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACTS REGARDING EACH OF PETITIONER'S COUNTS.**

**1.  Respondent's Deliberate Indifference to Petitioner's Safety and Medical Needs Violates the Fifth Amendment.**

Hull's evidence brought to deny the allegation that Hull was deliberately indifferent to Petitioner's medical needs actually supports Petitioner's allegation and is *prima facie* proof of the inhumane conditions in the NNRJ.

According to Hull, "The NNRJ medical department must submit a Prisoner Medical Request ("PMR") for outside medical care and consultations for Quaglin, as with any other federal inmate, to the USMS for approval," but admits that the USMS cannot be relied upon to grant permission in a meaningfully timely manner, and if the Jail observes an urgent need for outside care, the Jail must break the rules and circumvent USMS.  ECF No. 17 at 10.  This devastating

admission alone should shock the conscience of the Court and immediately call for emergency reform of the Federal prison system.[1]

Hull states that on March 9, 2021, NNRJ submitted a PMR to the USMS for "GI intolerance and Gluten Intolerance," but they saw that the need was so urgent that they could not wait for the USMS to approve, so instead, "knowing how long it takes to get appointments, NNRJ scheduled Quaglin for consultation with Gastroenterology Associates of Fredericksburg ahead of receiving approval for the PMR. The USMS requested additional information and finally approved the request on April 7, 2022." ECF 17 at 10.  According to Hull, it took a month to get USMS approval for ***a medical consultation*** – not a surgery, not a minor procedure, but just for a consultation - for a medical issue that the Jail recognized was so urgent that they had to break the rules and go behind the backs of USMS.  But it gets even worse.  According to Hull, Petitioner did not actually see a doctor for a GI consultation ***until April 29, 2022 – almost 2 full months from the time the Jail submitted the initial PMR on March 9.***  *Id.*  But it gets even worse.  At the consultation, the lab tests were ordered and the results did not arrive ***until May 18, 2022.***  A PMR was submitted to the USMS on May 2, 2022, and as of the date of the filing of the Response, June 7, 2022, he had not had a follow-up.  *Id.*  The follow-up was for "celiac disease with weight loss, food intolerance, and GI issues."  *Id.*  By this time, Petitioner had already lost over 35 pounds.  Exhibit A, Quaglin Decl. ¶ 14.    All the while, Respondent did nothing to expedite medical care for a condition that he admits required urgent care.

---

[1] If Hull should try to avoid responsibility for the deliberate indifference by pointing a finger at the USMS, "that argument goes nowhere."  ECF No. 25 at 4. The Court dismissed Attorney General Garland because Hull is the immediate custodian and therefore in the Habeas context Hull is responsible and accountable for any deliberate indifference to Petitioner's medical condition.  *Id.*  If Hull is not held accountable then no one is accountable and a federal prisoner under the control of USMS housed in a state or private prison would be deprived of the right to petition for habeas corpus; the federal government would evade responsibility on jurisdictional ground, and the local warden could just say, "it wasn't me; it was the feds."

This horrifying story is Hull's denial of the allegation that Petitioner is receiving inadequate healthcare in NNRJ.  No evidence is brought to deny the other allegations in the Petition.  *See generally* ECF No. 2-3; 2-4.  No evidence contradicts the allegations in Petitioner's Declaration. *See generally* Exhibit A.  No effort is made by Hull to explain away Petitioner's drastic weight loss, severe celiac symptoms, or the fact that Petitioner is currently housed in the medical wing and has not seen a doctor.  *Id.*  Most glaringly, the vindictive and unprofessional tone of Hull's emails to Petitioner's counsel show hostility and contempt for Petitioner, and are themselves evidence of deliberate indifference.  ECF No. 2-3; 2-4.

Hull denies the allegation that Petitioner was intentionally placed in a pod with others who had tested positive for Covid, citing only his own self-serving affidavit for support.  ECF No. 17 at 11.  But the affidavit supports Petitioner's allegation.  According to the affidavit, on December 20, 2021, an inmate had tested positive and was immediately removed, accordingly, Hull knew there was a known infection in the pod "as case numbers were rising due to the Omicron surge." Rather than quarantine the pod and close it off from new prisoners, the very next day, when Petitioner arrived having tested negative, Petitioner was placed in that very pod where Hull knew that Petitioner could be infected, and sure enough Petitioner and a number of other prisoners were infected a few days later.  ECF 17 at 11.  Even given the high standard to prove deliberate indifference regarding Covid infection in prison, the fact is that Hull has admitted to deliberately placing Petitioner in a pod where there was known infection just one day before Petitioner arrived. Whether he did it maliciously is a genuine issue of material fact.

Regarding the facts relating to Petitioner's celiac disease, this is clearly a genuine issue of material fact.  A Gluten-free diet requires special training to ensure that there is no cross-contamination with gluten.  Exhibit A, Quaglin Decl.  ¶¶ 4-7, 11-13.  Hull provides absolutely no

evidence that the staff has special training, that the Jail has a special procedure for inmates with celiac disease, or that the food provided to Petitioner was not cross-contaminated with gluten. At best, Hull provides evidence that the "menu" served to Petitioner is consistent with his medical condition, but he makes no guarantee that the food is not cross-contaminated. When Petitioner ate the meals provided to him, he experienced symptoms associated with ingestion of gluten-contaminated food. Ex. A ¶¶ 10-11. He brought all of this to the attention of the staff, but the staff made no effort to accommodate him. *Id.* Other courts have considered celiac disease a "serious medical condition" and the failure to provide a gluten-free diet as "deliberate indifference." *See, e.g.*, *Jamison v. Clarke*, Civil Action No. 7:18-cv-00504, 2021 U.S. Dist. LEXIS 48086 (W.D. Va. Mar. 15, 2021); *Watson v. Wash. Dep't of Corr.,* No. C17-5968-BHS-TLF, 2018 U.S. Dist. LEXIS 220412, at *8 (W.D. Wash. Nov. 15, 2018); *Nave v. Fuhrman*, No. 4:12cv225-MP/CAS, 2014 U.S. Dist. LEXIS 158675, at *32 (N.D. Fla. Sep. 11, 2014); *Devine v. Ryan,* No. CV-18-04286-PHX-MTL (MTM), 2021 U.S. Dist. LEXIS 138037, at *33-35 (D. Ariz. July 23, 2021).

Further, Petitioner's drastic weight loss (Exhibit A, Quaglin Decl. ¶ 14), is evidence sufficient to deny summary judgment. *See, e.g., Anderson v. Kooi,* No. 9:07-cv-1257 (DNH/GHL), 2011 U.S. Dist. LEXIS 35741, at *39 (N.D.N.Y. Jan. 24, 2011).

## 2. Respondent's Illegal Use of Solitary Confinement to Punish Petitioner Violates the Fifth Amendment.

The Government may detain a pretrial detainee to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution. *Bell v. Wolfish,* 441 U.S. 520, 536-37 (1979). The Supreme Court distinguished between "punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory

restraints that may." 441 U.S. at 537. Such "regulatory restraints" include administrative and disciplinary measures used by responsible jail officials "to maintain security and order" in detention facilities. *Id*. at 540.

Despite the Supreme Court's insistence that a distinction must be made between pretrial detainees and convicted inmates, Hull openly admits that all "inmates" including Petitioner, receive the same treatment. Hull also admits that Petitioner has spent considerable time in solitary confinement, but instead of solitary confinement, Hull calls it "punitive detention."

It is not in dispute that Petitioner was sent to solitary confinement. The genuine issue of material fact is whether Petitioner was sent there for legitimate security reasons or whether he was sent there as retaliation or unlawful, malicious, arbitrary punishment. Hull's evidence that there was a legitimate penal interest in sending Petitioner to solitary confinement consists of his own affidavit, the written prison policies, and 15 incident reports. His own affidavit is obviously self-serving and is no better than Petitioner's affidavit that contradicts it. *See generally* Exhibit A; ECF No. 2-5. The written prison policies are also no help because they only tell us what *should* happen, not what *did* happen. The incident reports are also unhelpful in telling the story. ECF No. 17-16.

To support his claim that Petitioner was justifiably punished for legitimate penal reasons, Hull cites Incident Reports 4, 5, 7, 8-13, 19-23, 25 (ECF No. 17-16 pages 4, 5, 7, 8-13, 19-23, 25). Each incident report contains a short narrative written by a staff member about the incident in question. By way of example, incident #4 states that on January 31, 2022, Petitioner "became disrespectful" to one of the Jail staff. According to incident #5, a few days later on February 3, Petitioner took an extra lunch tray off of the tray cart. For "disobeying a direct order and disrespectful behavior towards the staff," Petitioner was sent to solitary confinement for seven days. ECF No. 17 at 14. Then on another day, for "disrespectful behavior towards staff and for

approaching or gathering in a threatening manner," he was sent to solitary confinement for 30 days. *Id.* The narratives are vague and the corresponding punishments are arbitrary. The incident reports are not sufficient evidence such that no jury could believe Petitioner's declaration that he was unfairly punished. *See* Exhibit A, Quaglin Decl., ¶¶ 35-36. Accordingly, there is a genuine issue of material dispute.

### 3. Respondent's Illegal Jailing of Petitioner in Prolonged Solitary Confinement Violates the Fifth and Eighth Amendments.

Hull admits that Petitioner "has received 52 days of punitive discipline, of which he has served 48." ECF No. 17-12. Hull also admits that "punitive detention at NNRJ is served in two persons cell; however, they are not always full." This is Hull's way of admitting that inmates sent to punitive detention may be locked away in a room by themselves, or said differently, placed in solitary confinement. Though Hull and NNRJ do not like to use the term, they engage in the practices of solitary confinement and prolonged solitary confinement.

This is how Petitioner describes solitary confinement.

I was moved to a room in another area of the Jail. I am in a room by myself and I don't have any human contact for most of the day. I do not have access to a TV, a computer, or a laptop. I am denied video conferencing with my wife and child. There are no cameras or staff to monitor my safety. I am checked on a few times a day sporadically by the guards at no set intervals. When I first arrived here there was a clock that I could see which was helpful for me to document the staff's activities, but the clock was removed a few days ago. There are only two rooms in this part of the Jail. When I was in the medical wing, I saw the occupant of the other room because he came to medical. I recognized him as a prisoner who is known to be a terrorist with ties to Osama Bin Ladin and who was caught with 1000 pounds of explosives.

…

In addition to my celiac disease, I also have tinnitus, which causes an unbearable ringing sound in my ears. I also get pressure in my ears and head. The Jail used to provide Claritin pills upon request which helped alleviate these symptoms. Over the last ten days, I have requested Claritin but have not been provided with it. I

also used to request and receive vitamin D pills and a multi-vitamin upon request, but I have not been provided with that in the last ten days either.

…

Before my commissary access was stopped, I stocked up on protein bars. Now that is all I have to eat.  If I ration out my protein bars so that I ingest 900 calories a day, I will have enough food for 3 days. Under normal circumstances, I need to consume at least twice as many calories.  I do not get my commissary access back for another week.  The Jail has also limited my requests to once a week.  My requests are only picked up on Sunday or Monday.  That means that if I need anything at all I have to wait until Sunday or Monday to make the request.  Normally, requests can be made every day. I am withering away and in fear that if these conditions continue, I will suffer severe bodily harm, and even death.

Exhibit A, Quaglin Decl., ¶¶ 23-29.

### 4. Respondent's Repeated Interference with Petitioner's Right to Counsel and Meaningfully Participate in his Defense Violates the Sixth Amendment.

Since Petitioner arrived in prison, he has not been provided access to the discovery in his criminal case.  Exhibit A ¶ 19.  The only time he ever saw any discovery in his case was at a bond hearing when the Government played a few videos that he had never had a chance to view before the hearing.  *Id.*  Petitioner's undersigned counsel delivered Petitioner's discovery materials to the DC Jail in September of 2021; from that point delivery to Petitioner was the responsibility of Petitioner's immediate custodian – whoever that may be.  *See* Exhibit B, email arranging delivery to Jail.  Hull does not dispute this in his Response or in the emails attached to the Petition as Exhibit D (ECF No. 2-4 at 3 ("I will check on the discovery.")).  In his Affidavit attached to the Response as Exhibit 12, he states expressly, "No discovery materials for Mr. Quaglin have been mailed to or delivered to NNRJ," admitting that Hull took no steps to locate the discovery materials and deliver them to Petitioner.  ECF No. 17-12 ¶ 16.

The discovery materials were delivered by Petitioner's attorney to the DC Jail in September of 2021.  *See* Exhibit B; ECF No. 2-5.  Petitioner was moved in December to the Jail at USP

Lewisburg, then to Alexandria Detention Center, and then to NNRJ.  ECF No. 2 ¶¶ 59-66.  Hull was told repeatedly by Petitioner's counsel that Petitioner had not received his discovery materials, but Hull made no efforts to procure them.  Further, unlike other facilities, Petitioner has not been given any means via electronic device or otherwise, to view his discovery.  Exhibit A, Quaglin Decl. ¶ 19.  Depriving Petitioner of his discovery deprives Petitioner of his Sixth Amendment right to meaningfully participate in his own defense, and Hull does not deny this allegation.

It is undisputed that Hull has punished Petitioner by denying Petitioner access to the video conferencing system to meet with Petitioner's counsel.  ECF No. 17-23; ECF No. 2-4.  When Petitioner's counsel demanded that access be reinstated, Hull responded by admitting that the denial was punitive: "You HAVE abused the video visitation system and it is a privilege not a right.......take Inmate Quaglin's call or drive here and visit with Inmate Quaglin." ECF No. 2-4.  It is a violation of the Sixth Amendment to deny a pretrial detainee access to video conferences with counsel for punitive reasons.  *See S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 U.S. Dist. LEXIS 106416, at *102 (D.D.C. June 17, 2020).  Hull has done nothing to provide Petitioner with his discovery materials. Hull has maliciously and punitively prevented Petitioner from having meaningful access to his attorney during the pandemic, and by doing so Hull has violated Petitioner's absolute right to meaningfully participate in his defense.  *Id.*

It is undisputed that Petitioner has not received the discovery that was sent to him in custody by counsel.  It is not known if Hull is deliberately withholding the materials, or if he negligently lost them, but what is known is that so long as Petitioner is deprived of those materials, he is deprived of meaningfully participating in his own defense.  Petitioner has been punished for asking for them.  And Respondent Hull has failed to provide Petitioner with any reasonable alternative to access his discovery, participate in his defense, or confer with his lawyer. Petitioner's Sixth Amendment rights, therefore, have been clearly violated.

**5.   Respondent's Retaliation for Speaking to the Press and Members of Congress About His Unlawful Conditions of Detention Violates Petitioner's First Amendment Rights to Free Speech and Right to Petition His Government For redress of Grievances.**

Petitioner alleges that he was retaliated against by NNRJ and others for speaking to the press and members of Congress about his unlawful conditions of detention.  Hull does not dispute this in his Response.  On the contrary, the evidence provided by Hull directly supports this allegation.  Response, Exhibit 23 is a document that proports to be an "Incident Report" regarding Christopher Quaglin, dated March 25, 2022.  The "Incident Report" states,

> On the above date and approximate Family Liasson began receiving calls protesting inmate Christopher Quaglin's confinement.  It was then discovered that Inmate Christopher Quaglin's Attorney Joseph McBride was uploading video visits onto social media.  Due to this misuse of resources Attorney Joseph D. McBride's Securus account has been suspended until further notice.  End of report.

ECF No. 17-23.  In other words, the document expressly states that when the Jail learned that a damaging video was posted on social media, they retaliated against Petitioner and cut off access to his attorney indefinitely.  This is *prima facie* retaliation for something that was done, not by Petitioner, but by his attorney.  Further, the punishment was excessive on its face and did nothing to serve a correctional goal or to impose permissible regulatory restraints; the punishment only served to protect the Jail from further embarrassment on social media.

On December 30, 2021, Petitioner's counsel sent Hull a Notice of Violations Regarding Detainee's Rights, including a list of demands regarding Petitioner's rights.  ECF. No. 2-3.  Hull responded with an objectively disturbing email that failed to address any of the demands.  *Id.* Three days later, fourteen members of Congress sent a letter to the director of the Federal Bureau of Prisons, demanding that the situation regarding Petitioner be investigated.  *See* ECF No. 2 ¶ 73. The story became national news and the director of the Federal Bureau of Prisons resigned within 24 hours.  NNRJ has increased the intensity of Petitioner's punishment since that time, in direct

retaliation for bringing his grievances to the public and to elected officials in violation of his First Amendment rights.  ECF No. 2 ¶ 76

Hull cites the five elements that must be satisfied for a viable First Amendment retaliation claim in the prison context, and this instance meets them all.  *Anderson-Bey v. District of Columbia*, 466 F. Supp. 2d 51, 65 (D.D.C. 2006).  The document shows that (1) the Jail took an adverse action against him by cutting off his access to counsel; (2) because; (3) Petitioner exercised his free speech by speaking with his attorney, and the adverse action of depriving him of access to his counsel and exercising his free speech; (4) did not just chill the inmate's exercise of First Amendment rights, it completely deprived him of such rights; and (5) the adverse action served no correctional goal.

This is evidence of just one example of the systemic retaliation for any exercise of free speech that alerts the public of the Jail's inhumane conditions.

Hull's only defense against this systemic violation of Petitioner's constitutional right to free speech is to cite to NNRJ Policy P-01 (ECF No. 17-25), and to a "USMS Directive" (ECF No. 17-26).  The former is a policy that applies to members of the media ***not to inmates.***  The policy requires members of the media to obtain permission from the Jail to conduct interviews with inmates, and prohibits them from interviewing or photographing inmates without obtain the inmates' written consent.  The policy is actually meant to protect the inmates against unwanted media exposure without their consent; if the policy is violated by the members of the media, it means – by definition – that the inmate did not consent, and therefore cannot be punished.

The latter so-called "USMS Directive" is simply a one-line email written, apparently, by a United States Marshal to a prison official.  ECF No. 17-26.  It is not a "Directive" and cites no authority for any policy that prohibits inmates from speaking with the media without permission.

Rather than show that there is no genuine dispute of material fact regarding Petitioner's First Amendment retaliation claim, the evidence brought by Hull supports the claim, and therefore Hull's motion for summary judgment on this claim should be denied.

## V.   <u>CONCLUSION</u>

For the aforementioned reasons, this Court should deny summary judgment to the Respondent as to all counts.

**PETIONER'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE
CLAIMS OF VIOATION OF PETITIONER'S SIXTH AMENDMENT RIGHTS,
SOLITARY CONFINEMENT AND PROLONGED SOLITARY CONFINEMENT AND
REQUEST FOR A HEARING**

Comes now Petitioner Christopher Quaglin, by counsel, with his Cross Motion for Partial

Summary Judgment as to the Claims of Violation of Petitioner's Sixth Amendment Rights,

Solitary Confinement, and Prolonged Solitary Confinement.

## I.    STATEMENT OF MATERIAL FACTS

Petitioner incorporates fully as if set forth herein the Statement of Material Facts Section

in its entirety as set forth above in Section II of Petitioner's Opposition to Respondent Hull's

Motion to Dismiss.  For ease of reference, Petitioner sets forth here just the facts relevant to this

Cross Motion for Partial Summary Judgment:

1.  Petitioner exhausted his remedies prior to filing his Petition.  *See* Petitioner's Opposition
    to Respondent's Motion for Summary Judgment, Section II.

2.  The grievance process is irreparably broken and an exercise in futility.  *Id.*

3.  Petitioner's discovery materials were delivered to the DC Jail by Petitioner's counsel in
    September of 2021 and were received by the DC Jail.  *Id.*

4.  As Petitioner's immediate custodian, Respondent Hull is accountable for failing to deliver
    Petitioner's discovery to Petitioner and thereby depriving Petitioner of his constitutional
    right to participate in his own defense.  *Id.*

5.  Respondent Hull has acknowledged that he is responsible for the failure to deliver
    Petitioner's discovery materials to Petitioner and that it is his responsibility to cure the
    failure by locating and delivering Petitioner's discovery materials to Petitioner.  *Id.*

6.  Respondent Hull has taken no action to provide Petitioner with his discovery materials.  *Id.*

7.  Petitioner is placed in solitary confinement.  *Id.*

8.  Solitary confinement in all circumstances constitutes *de facto* punishment.  *Id.*

9.  Petitioner has been in prolonged solitary confinement.  *Id.*

10. Prolonged solitary confinement is torture.  *Id.*

11. Petitioner is unfairly punished.  *Id.*

12. Petitioner is generally mistreated and retaliated against.  *Id.*

13. Petitioner is unlawfully punished as a convicted inmate and not treated pursuant to his rights as a pretrial detainee. *Id.*

## II.   ARGUMENT

### A. SUMMARY JUDGEMNT SHOULD BE GRANTED TO PETITIONER WITH RESPECT TO THIS CLAIM THAT HIS SIXTH AMENDMENT RIGHTS WERE VIOLATED DUE TO RESPONDENT HULL'S FAILURE TO PROVIDE PETITIONER WITH HIS DISCOVERY MATERIALS.

As set forth in detail above in Petitioner's Opposition to Respondent Hull's Motion for Summary Judgment, incorporated by reference as if fully set forth herein, Petitioner's counsel delivered Petitioner's discovery materials to the DC Jail in September of 2021; Petitioner has never viewed his discovery materials, Respondent Hull is Petitioner's immediate custodian and is therefore accountable for and responsible to locate and deliver the discovery materials to Petitioner; without the discovery materials, Petitioner is deprived of his Sixth Amendment right to participate in his own defense; Petitioner has exhausted his remedies by bringing this matter directly to Respondent Hull who is the final authority of the grievance process.  Respondent Hull, Petitioner's immediate custodian, has acknowledged the matter but has NOT undertaken, as is required, any reasonable action to cure the ongoing flagrant violation of Petitioner's constitutional

rights.  *See generally* Petitioner's Opposition to Respondent's Motion for Summary Judgment, Section II, Section IV.B.4.

As there is no genuine issue of material fact, Summary Judgment is appropriate as to Petitioner's Sixth Amendment claim.

**B. SUMMARY JUDGMENT SHOULD BE GRANTED TO PETITIONER WITH RESPECT TO PETITIONER'S REQUEST FOR INJUNCTIVE RELIEF BANNING THE USE OF SOLITARY CONFINEMENT AND PROLONGED SOLITARY CONFINEMENT AGAINST PRETRIAL DETAINEES BECAUSE RESPONDENT MADE NO ARGUMENT AND PRESENTED NO EVIDENCE IN SUPPORT OF ITS MOTION.**

Petitioner's Habeas Petition uses the definition of solitary confinement provided in New York State's HALT ACT, which adopted the definition of solitary confinement provided by the United Nations Standard Minimum Rules for the Treatment of Prisoners, also known as the Nelson Mandela Rules.  *See* Exhibit C.  The HALT ACT and Mandela Rules define solitary confinement as a form of punishment that confines prisoners for twenty-two hours or more per day absent meaningful human contact.  Both the HALT ACT and Mandela Rules denounce prolonged solitary confinement as torture and ban its use under any set of circumstances.

Petitioner's underlying papers cite significant case law clearly demonstrating that pretrial detainees cannot be punished because they are innocent until proven guilty.  As such, pretrial detainees should never be subjected to solitary confinement because solitary confinement is a de facto punishment. Petitioner's third claim for relief alleges that prolonged solitary confinement should be outlawed because it is torture, and therefore, violative of the Eighth Amendment rights of all imprisoned persons.

Petitioner seeks as part of his relief for the Court to "Enter a temporary restraining order, preliminary injunction, and a permanent injunction banning the use of solitary confinement and prolonged solitary confinement against pretrial detainees."  ECF No. 2 ¶ 203(2).  In support of this

request, Petitioner noted, and this Honorable Court may respectfully take judicial notice of the fact that Communist Dictator and mass-murderer Joseph Stalin regularly used solitary confinement to punish political dissidents, and that the abhorrent practice has been condemned by the likes of Nelson Mandela, Senator Elizabeth Warren, and Senator Dick Durbin, the ACLU, Amnesty International, Human Rights Watch, the National Religious Campaign Against Torture, T'ruah the Rabbinic Call for Human Rights, and New York State Council of Churches - a coalition of numerous denominations.[2]

Importantly, Prolonged solitary confinement has been roundly condemned by the World Health Organization, the United Nations, and other international bodies, and has been completely banned in New York State. New York has also banned the use of solitary confinement against anyone with a serious underlying medical condition, and severely restricts the use of solitary confinement of any length only to "serious conduct" such as the risk of "imminent physical injury." *See generally* ECF No. 2 ¶¶ 130-47. Just recently, a Federal Court dismissed a constitutional challenge to New York's policy, thereby upholding its ban on the use of prolonged solitary confinement, as well as myriad restrictions on its use. *N.Y. State Corr. Officers & Police Benevolent Ass'n v. Hochul,* No. 1:21-cv-535 (MAD/CFH), 2022 U.S. Dist. LEXIS 107145, at *1 (N.D.N.Y. June 16, 2022).

Respondent does not dispute that Petitioner has been placed in solitary confinement at the DC Jail (*see, e.g.,* ECF No. 2 ¶ 50) and NNRJ (*see, e.g.,* ECF No. 2 ¶¶ 69, 73, 84; 91(5); 102). Nor does Respondent dispute the fact that Petitioner has been placed in prolonged solitary confinement DC Jail and NNRJ (*see, e.g.,* ECF No. 2 ¶ 106 ("Petitioner was sentenced to 45 days

---

[2] *See* Faith Leaders Call for an End to Solitary Confinement @ https://www.catholicnewsagency.com/news/41232/faith-leaders-call-for-an-end-to-solitary-confinement (last visited on August 25, 2022)

of solitary confinement…").  As late August 24, 2022, Petitioner was in solitary confinement at

NNRJ, and was only moved because Petitioner filed a Motion for a Preliminary Injunction with

this Court on August 24, 2022.  ECF No. 26 ("Affidavit of Christopher Quaglin").  But there is

currently no safeguard in place such that Petitioner should not reasonably expect to be subjected

to the same challenged deprivations in the future. *See FEC v. Wis. Right to Life, Inc.*, 551 U.S.

449, 463-64 (2007).  Petitioner has been in solitary confinement in almost every one of the facilities

that confined him.  Accordingly, the practice of solitary confinement is "capable of repetition, yet

avoiding review." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).  Even if Petitioner were

to be released tomorrow, his claims avoid mootness due in part to the multiple times that he has

experienced the horrors of this medieval practice in the past, and the substantial likelihood that

would soon again experience it in the future.


## III.    <u>CONCLUSION</u>

      For the foregoing reasons, Summary Judgement should be granted to the Petitioner for

the issues requested and appropriate relief should be granted.


Dated: New York, NY                Respectfully submitted,
August 26, 2022

                                     /s/ Joseph D. McBride, Esq.
                                     Bar ID:  NY0403
                                     THE MCBRIDE LAW FIRM, PLLC
                                     99 Park Avenue, 6th Floor
                                     New York, NY 10016
                                     p: (917) 757-9537
                                     e: jmcbride@mcbridelawnyc.com
                                     *Counsel for the Defendant*

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

I hereby certify that on August 25, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, with consequent service on all parties.

<u>/s/ Joseph D. McBride, Esq.</u>